Walter J. THOMAS, et al., Appellees/Cross–Appellants,

v.

Madeleine K. ALBRIGHT, Secretary of State, Appellant/Cross–Appellee.

Nos. 97–5004, 97–5018.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 13, 1997.

Decided March 27, 1998

Cynthia A. Schnedar, Assistant U.S. Attorney, Washington, DC, argued the cause for appellant/cross-appellee, with whom Mary Lou Leary, U.S. Attorney at the time the briefs were filed, John D. Bates, R. Craig Lawrence, and John Oliver Birch, Assistant U.S. Attorneys, were on the briefs.

Barbara B. Hutchinson argued the cause for appellees/cross-appellants Walter J.

Thomas, et al., with whom Theresa L. Watson, Washington, DC, was on the briefs.

Avis E. Buchanan, Washington, DC, argued the cause for amicus curiae plaintiff class, with whom Warren E. Connelly, Charles L. Warren, Richard P. Schlegel, and Joseph M. Sellers were on the briefs.

Before: EDWARDS, Chief Judge, GINSBURG, Circuit Judge, and BUCKLEY, Senior Circuit Judge.

GINSBURG, Circuit Judge:

This is a Title VII class action in which the plaintiffs allege that the United States Department of State discriminated against African–American Foreign Service Officers. The Department and a group of nine class members separately appeal from the district court's approval of the class settlement. The Department appeals the district court's decision to permit class members to opt out of the class settlement. The nine cross-appellants challenge the district court's approval of the consent decree as fair and reasonable. We affirm the district court's decision that the consent decree is fair and reasonable, but reverse its decision allowing opt-outs.

## I. Background

In 1984 Walter J. Thomas, a former Foreign Service Officer, filed an administrative complaint on behalf of himself and other African–American FSOs, alleging racial discrimination in the Department's employment practices. In 1986, after the Department had rejected Thomas' complaint, he and another former FSO filed a class action complaint in district court alleging that the Department engaged in racially discriminatory employment practices and retaliated against those who complained about them. *Thomas v. Christopher*, 169 F.R.D. 224, 229 (D.D.C. 1996).

The plaintiffs moved for class certification under Federal Rule of Civil Procedure 23(b)(2). The court denied their motion but permitted the plaintiffs to file an amended complaint adding several more plaintiffs. The parties conducted discovery for six years and, beginning in 1993, engaged in settlement negotiations, eventually under the supervision of a magistrate judge. In 1994 the plaintiffs filed another motion for class certification, in which they contended that although their class could be certified pursuant to Rule 23(b)(3), "it is more appropriately maintained as a Rule 23(b)(2) class action." The court deferred ruling upon this motion pending the outcome of the settlement negotiations.

In 1995 the parties reached a settlement in principle, and in January 1996 they signed a consent decree. The consent decree "resolves all claims that were or could have been brought" by African–American FSOs between 1984 and 1996 based upon racial discrimination in promotions, awards, tenuring, termination, performance reviews, assignments, and training, or upon retaliation for complaining about such discrimination. The parties agreed that the court would certify the class pursuant to Rule 23(b)(2).

The consent decree provided for the following relief:

(1) Monetary Relief—The Department agreed to pay a total of $3.8 million, to be allocated as follows: (a) $125,000 for the named plaintiffs ($40,000 to Thomas for "his leadership and coordinating role" and $85,000 divided equally among the 29 other named plaintiffs); (b) $2.9 million for those who experienced delays in and denials of promotions, to be allocated upon the basis of a formula specified in the consent decree, but not to class members who would receive a promotion under the consent decree or who had been promoted at the same rate as white employees; and (c) $775,000 for class members who had been terminated, of which at least $200,000 was to be distributed formulaically to those who were either terminated for unsatisfactory performance or constructively discharged, and up to $575,000 of which was reserved for a maximum of four recipients to be chosen upon the basis of, among other things, the severity of the discrimination and the degree of economic hardship they had suffered.

(2) Promotions—The Department agreed to give retroactive promotions to the 16 mid-level class members and to the one senior-level class member who had been at their

current grade-levels for the longest time and had been recommended previously for promotion.

(3) Reinstatement—The Department agreed to offer a new five-year appointment to each of four class members who had been fired when they failed to get tenure within the required time.

(4) Injunctive and Prospective Relief—The Department agreed to: (a) submit to an injunction against its discriminating on the basis of race or retaliating for equal employment opportunity activities; (b) create a Council for Equality in the Workplace to monitor the EEO activities of the Department; (c) modify its employee evaluation reports and engage a consultant to help determine whether further revisions are necessary; (d) revise and expand its diversity and EEO training; (e) establish a working group to monitor the grant of awards to employees; (f) use its best efforts to include an African–American on any board considering an African–American for termination; (g) continue development of an electronic personnel database to monitor employment actions; (h) report employment and EEO information to class counsel for four years; and (i) adopt an affirmative action plan approved by the Equal Employment Opportunity Commission.

(5) Attorneys' Fees—The Department agreed to pay $2.1 million in attorneys' fees, plus an additional amount for any services rendered after the district court's preliminary approval of the consent decree.

Class counsel and the Department also entered into a letter agreement providing that (1) the consent decree would not address the issue of opt-outs; and (2) class counsel would (a) support the settlement in court as "fair and reasonable to the class as a whole"; (b) not take a legal position regarding opt-outs other than to advise the court that it "may have the discretion to allow opt outs"; and (c) not advocate that class members opt out.

In March the district court held a two-day hearing and preliminarily approved the consent decree. The court then ordered that the consent decree and notice of the fairness hearing be sent to all known class members. 169 F.R.D. at 231. The notice advised class members that the court might grant them the right to opt out. Of 359 class members, 34 wrote the court in support of the consent decree and 55 wrote in opposition. *Id.* at 235.

In June class members were informed of their individual awards under the consent decree. The Department, as agreed, retroactively promoted 17 class members and reinstated four. It awarded an average of $10,900 in promotion damages to 265 class members. Twenty-nine class members received an average termination award of $16,-400, and the four class members who had incurred the greatest injuries received an average termination award of $75,000. *Id.* at 234–35.

At the fairness hearing later that month 14 class members testified; three supported the consent decree, eight opposed it, and three were "ambivalent or neutral." *Id.* at 235. The court required the Department to send notices to opponents of the agreement informing them that if they wished to opt out then they had to file a motion stating "the reasons for this request, and any law" supporting it. Of the nineteen class members who filed motions to opt out all but nine chose ultimately to remain in the class.

The court certified the class under Rule 23(b)(2) and approved the consent decree pursuant to Rule 23(e). The court found that the settlement was "negotiated at arm's length and presents no danger of collusion"; it then held that the consent decree was fair and reasonable in light of the disputed evidence and the risks of litigation. Nonetheless, the court allowed those class members so desiring to opt out of the consent decree. *Id.* at 239–44.

## II. Analysis

The Department of State appeals the district court's decision permitting opt-outs, while the cross-appellants, nine members of the plaintiff class, object to the court's approval of the consent decree. Class counsel submitted a brief in support of the consent decree but did not take a position concerning the dissidents' right to opt out.

## A. Fairness of the Consent Decree

Rule 23(e) states that "[a] class action shall not be dismissed or compromised without the approval of the court." Before it can approve a settlement a district court "must find that the settlement is fair, adequate and reasonable and is not the product of collusion between the parties." *Cotton v. Hinton,* 559 F.2d 1326, 1330 (5th Cir.1977); *see Isby v. Bayh,* 75 F.3d 1191, 1196 (7th Cir.1996); *Van Horn v. Trickey,* 840 F.2d 604, 606 (8th Cir.1988); *Grant v. Bethlehem Steel Corp.,* 823 F.2d 20, 22 (2d Cir.1987). The court's primary task is to evaluate the terms of the settlement in relation to the strength of the plaintiffs' case. *See, e.g., Isby,* 75 F.3d at 1199. The court should not reject a settlement merely because individual class members complain that they would have received more had they prevailed after a trial. *See EEOC v. Hiram Walker & Sons, Inc.,* 768 F.2d 884, 889 (7th Cir.1985); *see also United States v. Trucking Employers, Inc.,* 561 F.2d 313, 317 (D.C.Cir.1977).

The dissident members of the class in this case contend that for a host of reasons the district court abused its discretion in approving the consent decree as fair. We conclude, to the contrary, that the settlement is eminently fair and reasonable to the class as a whole.

First, with respect to the class-wide relief the dissidents complain that the consent decree does not (1) alter the Department's allegedly discriminatory assignment system, (2) give any "relief for retaliatory acts taken by the Department," or (3) provide for the expungement of employee records infected with discrimination. In making the first two charges the dissidents seem oblivious to the significant monetary, reinstatement, and promotional relief awarded to class members who claim the Department discriminated or retaliated against them. Moreover, the injunction prohibits discrimination in general and in assignments in particular, forbids retaliation, and prescribes monitoring procedures so that class counsel can ensure the Department complies. Together these provisions of the consent decree both redress past and deter future discrimination in assignments and inhibit future retaliation. Finally, although the consent decree does not provide for expungement of employee records potentially tainted by discrimination, it does require revisions to the employee evaluation reporting form in order to help prevent racial discrimination in the future.

Second, the dissidents argue that the consent decree is inadequate with respect to the compromise of claims regarding discrimination in promotions. While the district court found no statistically significant evidence of such discrimination in the junior and senior grades, the plaintiffs did present statistical evidence suggesting that there had been between 40 and 47 fewer promotions, primarily in the mid-level grades, than there would have been but for discrimination. The Department presented its own statistical evidence suggesting that the shortfall was at most 10 promotions. The district court reasonably determined that in view of the conflicting evidence, the compromise calling for 17 promotions was fair and reasonable. Moreover, those who were not awarded a promotion received monetary compensation for delays in and denials of promotions.

Relatedly, the court did not abuse its discretion in approving the provision of the consent decree calling for only one promotion to be made in the senior grades; there was no statistically significant evidence of any shortfall of promotions in those grades. Nor did the district court abuse its discretion when it concluded that the consent decree was fair in awarding retroactive promotions only to those active FSOs who had been at their current grade the longest and who had been recommended for but not granted a promotion. To determine which individual class members would have been promoted but for discrimination would have been difficult for all concerned, wherefore we cannot say that the quick and dirty alternative upon which the parties settled was unreasonable. We reject also the dissidents' contention that it was unfair not to provide any monetary award to those who received a promotion. A settlement necessitates compromise, and the agreement that some individuals would get a promotion while others would get cash is not an unreasonable way to allocate two scarce resources.

Third, the dissidents contend that the consent decree is insufficient regarding reinstatement. They argue that (1) four reinstatements was too few; (2) the reinstatements went only to employees who were terminated when they failed to get tenure and not to tenured employees who were terminated for allegedly poor performance; and (3) those who were reinstated should have received tenured positions rather than returning as untenured employees. The parties presented conflicting evidence regarding whether there was a statistically significant excess in the number of African-American employees terminated. The Department's expert argued that employees terminated when they did not get tenure should be treated separately from tenured employees fired for performance-related reasons because the two types of adverse decisions are unrelated. Nonetheless, the Department's expert opined that terminations of neither tenured nor untenured African–American employees were significantly above the norm.

■ We conclude that the district court properly held both that four was a reasonable number of reinstatements and that the agreement limiting reinstatement to those who were terminated for failing to reach tenure was fair in light of the parties' competing statistical analyses and the risks attendant to litigation. Further, although the number of reinstatements was limited to four, 29 of the 30 employees who applied for termination damages received a monetary award. Again, the dissidents have not shown that this division of the settlement proceeds is unreasonable considering the interests of the class as a whole. As for the reinstatements being without tenure, none of the dissidents appears to be among those reinstated; therefore, the dissidents do not have standing to pursue this particular objection to the class settlement. See Pettway v. American Cast Iron Pipe Co., 576 F.2d 1157, 1181 (5th Cir.1978) ("[A]ppellants who were excluded from the subclass and denied back pay lack standing to contest the adequacy of the awards received by other class members").

Fourth, the dissidents appear to complain that they did not receive sufficient monetary relief. We conclude, however, that the district court did not abuse its discretion in approving as fair, adequate, and reasonable the amount of the damages provided in the consent decree. Class counsel estimated the Department's overall exposure to liability at from $2.5 million to $4 million while the Department put the figure at from $725,000 to $1.5 million; each side had reasonable arguments for its position. Based upon the conflicting evidence and arguments, the risks of litigation, and the time value of money, the district court reasonably determined that the $3.8 million upon which the parties had settled was "at the high end" of what the class could have expected after trial. The dissidents complain that the settlement "unfairly limited monetary relief for egregious acts of discrimination to four persons." The dissidents provide no reason why it was unfair to award an average of $75,000 in damages to the four most significantly injured of the terminated class members. A claim that individual dissenters are entitled to more money is not, by itself, sufficient to reject the overall fairness of the settlement; as we indicated above, a settlement necessitates compromise.

Fifth, the dissidents argue that it was improper for the court to approve the settlement over the objections of a large number of class members, including several of the named plaintiffs. But a settlement can be fair even though a significant portion of the class and some of the named plaintiffs object to it. See Grant, 823 F.2d at 23; Hiram Walker, 768 F.2d at 891–92; Cotton, 559 F.2d at 1331; Flinn v. FMC Corp., 528 F.2d 1169, 1173 (4th Cir.1975); cf. Pettway, 576 F.2d at 1215–17 (acknowledging general rule but holding settlement unfair where approximately 70% of class and all named plaintiffs objected). Here only 15% of the class members objected; 85% accepted the settlement, and many of them actively supported it. The district court did not abuse its discretion, therefore, in approving the settlement in spite of some opposition.

The dissidents cite Ficalora v. Lockheed California Co., 751 F.2d 995 (9th Cir.1985),

and *Mandujano v. Basic Vegetable Products, Inc.*, 541 F.2d 832 (9th Cir.1976), for the proposition that it is an abuse of discretion for a district court to approve a settlement over the objection of the named class members. The teaching of those cases, however, is that the district court must consider the objections raised by the named plaintiffs. *Ficalora*, 751 F.2d at 997; *Mandujano*, 541 F.2d at 836–37. In *Mandujano* the court also said that the opposition of a significant number of named plaintiffs "is a factor to be considered when approving a settlement." 541 F.2d at 837. Here the district court conducted hearings and permitted all interested parties, including the dissidents, to testify. The court considered the objections of the plaintiffs but pointed out that "the best interests of the class as a whole must remain the paramount consideration even though some class members believe that they will not receive all the individual relief to which they believe they are entitled." 169 F.R.D. at 243. The district court's decision is therefore consistent with the Ninth Circuit cases cited.

Finally, the dissidents argue that class counsel did not act in the interest of the class when counsel agreed to argue that the consent decree was fair and not to advocate the right to opt out, and agreed to the provision of the consent decree stating that the court may not modify the agreement. In our view counsel more than adequately represented the class as a whole. The letter agreement to which the dissidents point was part of a global compromise between the parties, who had negotiated their settlement only after significant discovery and under the supervision of a magistrate judge. In view of the complexity and fragility of such a compromise, the provision prohibiting the court from modifying the terms of the agreement is understandable as being in the interests of both parties; it is not indicative that class counsel acted in any way at the expense of the class.

In sum, the dissidents complain about particular portions of the overall settlement and claim that they are individually entitled to more. It is the obligation of the district court, however, to evaluate the fairness of the settlement to the class as a whole. We conclude that the district court did not abuse its discretion in approving the consent decree as fair, adequate, and reasonable to the class as a whole.

B. Opting Out

The Department argues that our recent decision in *Eubanks v. Billington*, 110 F.3d 87 (D.C.Cir.1997), holding that a court may permit members of a class certified under Rule 23(b)(2) to opt out of the class action and thus retain the right to sue on their own, is invalid after the still more recent decision of the Supreme Court in *Amchem Products, Inc. v. Windsor*, —— U.S. ——, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997). Alternatively, the Department contends that under the criteria of *Eubanks* the district court abused its discretion in permitting the dissidents to opt out. We conclude that *Amchem* does not affect our holding in *Eubanks,* but we agree with the Department that under *Eubanks* the district court abused its discretion in permitting the dissidents to opt out.

Rule 23(a) establishes four prerequisites for certifying a lawsuit as a class action. They are that

(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Rule 23(b) provides for three types of class actions. Subsection (b)(1) allows a class action if separate actions would risk inconsistent adjudications or if individual adjudications would "be dispositive of the interests of the other members not parties ... or substantially impair or impede their ability to protect their interests." Under subsection (b)(2) a class action may be maintained where

the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole.

Finally, a subsection (b)(3) class action is appropriate where

> the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

The requirements of predominance and superiority in subsection (b)(3) are, of course, additional to the requirements of subsection (a), which applies to all class actions. The right to opt out of a subsection (b)(3) class action is expressly provided in Rule 23(c)(2).

In *Amchem* the Supreme Court addressed the procedure for approving a class action settlement. In that case the parties had simultaneously filed a class action complaint, an answer thereto, and a settlement agreement. The district court certified the class action under Rule 23(b)(3) and approved the settlement. The Third Circuit reversed, holding that the district court should have evaluated whether to certify the class just as it would have done if the action were going to be tried. *Georgine v. Amchem Prods., Inc.*, 83 F.3d 610, 624–26 (1996).

■ The Supreme Court affirmed the judgment of the court of appeals although it clarified that "settlement is relevant to a class certification" in that, if the case is surely going to be settled, then the "district court need not inquire whether the case, if tried, would present intractable management problems." *Amchem Prods., Inc. v. Windsor*, —— U.S. ——, ——, 117 S.Ct. 2231, 2248, 138 L.Ed.2d 689 (1997). A "settlement-only class certification" does, however, depend upon compliance with all the requirements of Rule 23(a) and (b). The Court made clear that a district court is to adhere closely to the rule:

> [O]f overriding importance, courts must be mindful that the rule as now composed sets the requirements they are bound to enforce.

> \*    \*    \*    \*    \*    \*

> Federal courts ... lack authority to substitute for Rule 23's certification criteria a

standard never adopted—that if a settlement is "fair," then certification is proper. *Id.* at ——, ——, 117 S.Ct. at 2248, 2249.

The Department contends that this court's recent decision in *Eubanks* was effectively overruled by the Supreme Court's direction in *Amchem* that courts are bound to observe strictly the requirements of Rule 23. *Eubanks* was a Title VII class action brought against the Librarian of Congress and certified under subsection (b)(2). The district court approved the parties' settlement and held that even if there were a right to opt out of a subsection (b)(2) class action, the individual plaintiffs had failed to show that they were entitled to opt out. Upon appeal we held that, although the district court may in certain circumstances permit members of the plaintiff class to opt out of a (b)(2) suit, the court in that case had not abused its discretion in declining to do so. We recognized that Rule 23 does not "address the possible need for opt-out rights in non-(b)(3) actions," but we thought the Rule "sufficiently flexible to afford district courts discretion to grant opt-out rights in (b)(1) and (b)(2) class actions" in certain circumstances. *Eubanks*, 110 F.3d at 93, 94. We based that ruling upon Rule 23(d)(5), which specifically authorizes the court to make "appropriate orders" to govern "procedural matters" in a class action; subsection (d)(5) is broad enough, we held, to permit the district court to provide for opt-outs when appropriate in (b)(1) and (b)(2) class actions. *See id.* at 96; *see also* Fed.R.Civ.P. 23(d) advisory committee's note (1966) (stating that subsection (d) "is concerned with the fair and efficient conduct of the action").

■ We went on to say that the district court may, when necessary to the fair and efficient conduct of the litigation, exercise its discretion to allow opt-outs in at least two ways. First, if the court finds that "the assumption of cohesiveness" underlying certification of a (b)(2) class is inapplicable to the individual class members' claims for monetary damages, then it may certify a hybrid class action under subsections (b)(2) and (b)(3)—the latter of which contemplates individual damages determinations. *Eubanks*, 110 F.3d at 96. Second, if the court deter-

mines that particular plaintiffs' claims are "unique or sufficiently distinct from the claims of the class as a whole," as, for example, where a member of the plaintiff class had filed his own civil action before the class action was filed, *see, e.g., County of Suffolk v. Long Island Lighting Co.,* 907 F.2d 1295, 1304–05 (2d Cir.1990), then it may permit optouts "on a selective basis." *Eubanks,* 110 F.3d at 96.

Nothing in the interpretation of Rule 23 we advanced in *Eubanks* is inconsistent with the Supreme Court's subsequent decision in *Amchem.* The district court's error in *Amchem* had been in substituting the fairness inquiry of Rule 23(e) for the certification requirements of Rule 23(a) and (b). In *Eubanks* we did not omit or even relax any requirement of Rule 23; rather, we held only that in certain limited circumstances the district court has discretion under subsection (d)(5) to permit opt-outs, notwithstanding the absence of a specific authorization in subsection (b)(2).

■ In the alternative the Department argues that the district court abused its discretion by permitting opt-outs because it did not follow either of the options for doing so outlined in *Eubanks.* When the district court issued the decision now before us, *Eubanks* had not yet been decided. Relying instead upon *Holmes v. Continental Can Co.,* 706 F.2d 1144 (11th Cir.1983), the district court asserted that allowing optouts is appropriate "when the monetary relief stage . . . is functionally more similar to a (b)(3) class than to a (b)(2) class." 169 F.R.D. at 244. The court was "impressed with the vehemence with which some members of the class have opposed the settlement" and noted its "concern" that "in the absence of allowing for 'opting out' some searing individual injury might be greatly under compensated." *Id.* at 245.

We agree that the district court abused its discretion when it allowed class members to opt out of the settlement in this case. The district court did not pursue either of the two options we later approved in *Eubanks,* nor did it adduce any other tenable ground upon which opting out might be permitted. Indeed, the dissident plaintiffs do not argue

that their case fits within either of the two circumstances instanced in *Eubanks,* nor do they suggest any alternative basis upon which we can uphold the decision of the district court.

First, the district court clearly did not certify a hybrid class action based upon a finding that "the assumption of cohesiveness for purposes of injunctive relief that justifies certification as a (b)(2) class is unjustified as to claims that individual class members may have for monetary damages." *Eubanks,* 110 F.3d at 96. Class counsel repeatedly requested certification pursuant to (b)(2), the consent decree stated that the parties agreed to certification pursuant to (b)(2), and the court ultimately certified the class pursuant to (b)(2). Although the district court in allowing opt-outs did refer to the distinction between a (b)(2) and a (b)(3) class action, the court did not purport to hold, and did not make findings sufficient to support the conclusion, that a hybrid class certification was appropriate: The court found neither that the assumption of cohesiveness underlying a (b)(2) class certification was unjustified with respect to plaintiffs' individual claims for monetary damages, nor that the monetary or other individual claims were appropriate for certification under (b)(3). Nor did the district court address the predominance and superiority requirements for certification under (b)(3). To the contrary, the court made all the factual findings necessary to show that a hybrid class was not appropriate. The court determined that the plaintiffs sought "extensive injunctive and systemic relief in addition to monetary damages," 169 F.R.D. at 239, and found that the plaintiffs' "predominantly equitable claims . . . arose from a system of personnel actions that have been uniformly imposed on all class members," *id.* at 238.

We recognized in *Eubanks* that whenever individual plaintiffs in a subsection (b)(2) class have claims for different amounts of damages, their interests may begin to diverge. 110 F.3d at 95. As noted above, however, before hybrid certification is appropriate there must be some reason to believe that the assumption of cohesiveness underlying a subsection (b)(2) class action does not

apply to the individual claims for monetary damages; for example, the amounts claimed by various class members may be so disparate as to create a conflict of interest within the class. Here the district court did not find that the assumption of cohesiveness had broken down; nor do the dissident plaintiffs so argue before this court.

Second, the district court did not find that the claims of the individual dissidents are so atypical of the claims of the class as to justify permitting them to opt out of the class. The court stated that there might be some class member(s) with a "searing individual injury" who would be "under compensated" if limited to the relief provided in the consent decree. The court did not determine, however, that there are in fact such persons in the class, let alone that the dissidents are among them. The dissidents do not even argue that they have suffered an unusually grave degree of injury; rather, they argue merely that they stand to be undercompensated for their injuries. As we made clear in *Eubanks*, however, that is not a sufficient justification for permitting members of the class to opt out:

> That ... appellants received less under the settlement agreement than they might have expected to receive had they prevailed in individual lawsuits cannot alone justify an opt-out, as no party can reasonably expect to receive in a settlement precisely what it would receive if it prevailed on the merits.

*Id.* at 98. Moreover, this argument was more properly directed to the issue of fairness, *id.* at 98–99, and as such it was rejected both by the district court in the fairness hearing and by this court (in Part II.A, above). Nor are the dissidents' claims different in kind from those of other class members: In certifying the class the court specifically found that the claims of the named plaintiffs, including eight of the nine cross-appellants, were "typical" of the claims of the class as a whole. 169 F.R.D. at 238.

Third, although the district court could properly rely upon *Holmes* before we issued *Eubanks*, it erred in its application of that case and thereby abused its discretion. *See Koon v. United States*, 518 U.S. 81, 98–100, 116 S.Ct. 2035, 2047, 135 L.Ed.2d 392 (1996)

("A district court by definition abuses its discretion when it makes an error of law"). In *Holmes* the court held that "[t]he presence in the lawsuit of a significant number of atypical claims not common to the class" required the district court to permit opt-outs. 706 F.2d at 1155. The court also suggested that the assumption of cohesiveness in Rule 23(b)(2) claims for injunctive relief may break down when there are individual claims for disparate amounts of monetary damages and that in such cases opt-outs may be required. *Id.* at 1159–60. As we have pointed out, however, here the district court did not find (and the dissidents do not contend) that the dissidents' claims are atypical or that the assumption of class cohesiveness has broken down.

The dissidents argue, at least implicitly, that they should be permitted to opt out because several of them had individual discrimination complaints pending against the Department. In *Eubanks*, however, we rejected the contention that a pending administrative complaint—as opposed to a lawsuit filed in court—is sufficient to support a class member's preference to opt out of a class action. *See* 110 F.3d at 97. One may not, by first filing an administrative charge and then affirmatively joining a class action as a named plaintiff or an intervenor, obtain the option to see whether the result in the class suit is satisfactory and, if not, then to take up the administrative charge again.

The dissidents also argue, as they emphasized at oral argument, that they must be permitted to opt out because they object to the settlement of their individual claims (as opposed to the class claims). This is not the law; otherwise members of the plaintiff class would have to be allowed to opt out whenever there are individual claims for monetary damages in addition to class claims for injunctive relief. *Eubanks* itself involved claims for injunctive as well as monetary relief, however, and we upheld the district court's decision not to permit opt-outs. Insofar as the dissidents mean to suggest that their individual claims for monetary damages are somehow unique or atypical, as noted above they give us no reason to accept that conclusion.

We hold, therefore, that the district court abused its discretion in permitting the dissident class members to opt out of this class action; the district court made no findings that would support opting out under *Eubanks*. Nor is it necessary to remand the case for the district court to make further findings in light of *Eubanks*; the Department argued in its brief that a remand was not necessary, and the dissidents did not seek a remand to develop the record further in the event we determined that *Eubanks* was not satisfied. Moreover, the dissidents do not allege any alternative basis that, if proved, would enable the district court upon remand again to permit them to opt out.

## III. Conclusion

For the reasons stated above, we hold that the district court did not abuse its discretion in approving the fairness of the consent decree. We also conclude that *Amchem* does not undermine this court's holding in *Eubanks*, and that the district court abused its discretion in permitting some members of the class to opt out of the settlement of this case. Accordingly, we uphold the district court's approval of the consent decree and direct that it be made binding upon all members of the class.

*So ordered.*